Rose **GEHLING, admx. of the Estate of Earl J. Gehling and the Estate of Earl J. Gehling, and Rose Gehling on her own behalf, Plaintiff,**

v.

**ST. GEORGE UNIVERSITY SCHOOL OF MEDICINE, LTD., Defendant.**

**No. 86 CV 1368.**

United States District Court, E.D. New York.

Oct. 12, 1988.

See also, 2d Cir., 773 F.2d 539.

Shor, Levin & Weiss, P.C., Elkins Park, Pa., for plaintiff; Lawrence D. Levin, of counsel.

Donald J. Werner, Massapequa Park, N.Y., for defendant.

## MEMORANDUM–DECISION AND ORDER

BARTELS, District Judge.

On April 18, 1982, Earl J. Gehling died after having voluntarily participated in the "Saint George's University School of Medicine ("SGU") road race" of 2.6 kilometers between the two campuses of St. George's University Medical School, a Grenadian corporation, located in Grenada. At the time of his death, Gehling, a student at SGU, was 5' 11", and weighed 240 pounds. His general health at the time of the race is disputed. Prior to enrollment at the school, the decedent indicated his knowledge, in writing, that Grenadian health facilities, in general, were not of the same high standard as those in the United States. The race was unsupervised by SGU, and the school allegedly did not provide any medical care and surveillance for race participants. Moreover, the school did not require runners to submit to any type of pre-race screening or physical examination. The race was organized by students and was open to both students and non-students alike. The race held on April 18, 1982, was run, unlike prior races, at approximately 3:00 P.M. under tropical conditions. Upon crossing the finish line, Gehling collapsed. Several doctors were present, including at least one SGU employee.

According to the SGU newsletter, which is published by the defendant, the decedent was "immediately" treated by three faculty physicians and two students who were physician's assistants. An unsuccessful attempt was made to revive him which included administration of oxygen. The decedent was thereafter brought by ambulance to the government-operated General Hospital. Gehling died several hours later, despite the efforts of at least three other doctors. Subsequently, what the plaintiff describes as an "unauthorized post-mortem examination" was performed on Gehling's body by a local "undertaker", who allegedly never advised the family of the true outcome of the examination. A second autopsy was later performed in the United States at plaintiff's request. The findings of the second pathologist were at variance with those of the first.

The plaintiff, Rose Gehling[1], a resident of Pennsylvania, originally instituted this action on September 2, 1983, in the United States District Court for the Middle District of Pennsylvania, claiming that the race was run and controlled by SGU, and accusing SGU and Foreign Medical School Services Corporation ("FMSSC") of committing wrongful acts which caused Earl Gehling's death. The causes of action unrelated to the Pennsylvania forum were transferred to this district by the Pennsylvania court pursuant to 28 U.S.C. § 1631, for lack of *in personam* jurisdiction over the defendants. As stated by the Pennsylvania court, the causes of action now before us solely concern events occurring in Grenada. Memorandum order of Judge Conaboy, 4/14/86 at 10–11. The Eastern District of Pennsylvania, in its Order transferring the case to this District, stated that

[a]lthough we have grave reservations regarding whether the plaintiff can maintain either personal jurisdiction over the defendant St. George's Hospital in the Eastern District of New York or venue in that forum, ... we shall sever the causes of action in this case and transfer to the EDNY the following counts of plaintiff's Substituted Third Amended Complaint:

a. Count 1: Negligence
b. Count 2: Strict Liability
c. Count 5: Battery on a corpse
d. Count 6: Medical Malpractice
e. Count 7: Negligence in the Conduct of a Road Race.

*Id.* Interspersed throughout the transferred counts are claims of fraud or misrepresentation.

The two defendants, SGU and FMSSC, while stipulating that this Court has juris-

[1]. The plaintiff is suing the defendants on behalf of the estate of Earl Gehling, on behalf of her deceased husband's estate, as well as on her own behalf.

diction over both parties, moved for summary judgment. On July 8, 1988, we granted summary judgment in favor of FMSSC, while reserving our ruling on SGU's motion.

## I. *Choice of Law*

■ We have earlier informed the parties that New York courts would normally apply the substantive law of Grenada in this action (Memorandum–Decision and Order, 6/13/88). Accordingly, pursuant to Fed.R.Civ.P. 44.1, the Court ordered the defendant to submit proof of Grenadian law.

Rule 44.1 of the Federal Rules of Civil Procedure provides:

A party who intends to raise an issue concerning the law of a foreign country shall give notice by pleadings or other reasonable notice. The court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination shall be treated as a ruling on a question of law.

Under Rule 44.1, "the court is free to insist on a complete presentation [of the foreign law] by counsel." Fed.R.Civ.P. 44.1 advisory committee's note. This Court has so insisted and finds the parties' submissions less than satisfactory no matter which side is considered as having the burden of proving Grenadian law. Trying this case on the basis of the limited, and sometimes misstated, Grenadian law thus far submitted would be impossible, or at least irresponsible. The original proponent of Grenadian law, SGU, apparently concurs with this judgment, and accordingly has withdrawn its motion for the application of Grenadian law. The plaintiff has interposed no objection to the non-applicability of Grenadian law. The Court rules, then, that the law of New York will govern this case. *See Rolnick v. El Al Israel Airlines, Ltd.,* 551 F.Supp. 261, 264 n. 2 (E.D.

N.Y.1982) (New York law would apply where parties failed to prove foreign law).

We now consider the first part of SGU's motion for summary dismissal, i.e., dismissal of the wrongful death claim as untimely.[2]

## II. *Limitation Periods for Wrongful Death*

That New York law is to govern this case does not mean Grenadian law is irrelevant. New York's "borrowing statute", section 202 of the New York Civil Practice Law & Rules (hereinafter "CPLR") provides in pertinent part that "[a]n action based upon a cause of action accruing without the state cannot be commenced after the expiration of the time limited by the laws of either the state or the place without the state where the cause of action accrued...." CPLR 202 (McKinney 1972). This suit was commenced seventeen months after Gehling's death.

Both parties agree that the survival causes of action are timely under New York and Grenadian law, leaving only the question of the limitation period of the wrongful death action.

Under New York law the time within which an action for wrongful death must be brought is two years. N.Y. Estates, Powers & Trusts Law 5–4.1 (McKinney 1981).

■ The applicable Grenadian law governing the time for bringing such a suit is disputed. SGU contends that the applicable time period is contained in the Grenadian Compensation for Injuries Act (the "Grenadian Act"). That act prescribes a twelve month period for bringing suit. *See* 1 Revised Laws of Grenada, ch. 65. SGU contends that this twelve month period is a condition precedent which need not be pled as an affirmative defense, but, in the alternative, moves to amend its answer to add a statute of limitations defense. Plaintiff contends that the applicable time period is contained in the English Fatal Accidents Act of 1976 (the "English Act"). A suit

---

2. The law on summary judgment was discussed in our July 8, 1988 Memorandum–Decision and Order. We need not repeat it here.

under that act must be brought within three years of the decedent's death. *See* 31 *Halsbury's Laws of England*, "Negligence" 202–212 (4th ed. 1974) (hereinafter *"Halsbury"*); 24 *Halsbury*, "Limitations of Actions" 639. Plaintiff claims that the English Act is Grenadian law and overrides any law to the contrary. Moreover, plaintiff argues that the applicable limitation period is a statute of limitation which SGU should not, at this late day, be allowed to assert as a defense.

To determine the validity of the parties' contentions, a review of Grenadian history and English law is warranted.

From 1763 to 1967 Grenada was essentially a colony within the Commonwealth of the United Kingdom.[3] The Grenadian Act was promulgated by the Grenadian legislative council in 1885. *See* 1 Revised Laws of Grenada ch. 65.

By the West Indes Act of 1967, Grenada became an associate member of the Commonwealth. West Indes Act, 1967, 15 & 16 Eliz. 2, ch. 4; 7 *Halsbury*, "Commonwealth & Other Territories" 271–85.

Section 10 of the act provides that the associate status of an associate member can be terminated by the legislature of an associate member or by the English monarch acting by Order in Council.

Section 11 of the act provides that after associate status is terminated, "no Act of the Parliament of the United Kingdom ... shall extend, or be deemed to extend, to the former associated state as part of its law."

In 1973, Grenada's status as an associate member of the Commonwealth was terminated. Grenada Termination of Association Order, 1973, S.I. 1973/2157.

In March of 1979, the People's Revolutionary Government was swept into power on Grenada. Davidson, *supra* at 13; Gilmore, *supra* at 20. On March 25, 1979,

People's Law No. 5 was promulgated providing that all pre-revolutionary law was to remain in force until repealed or amended. Davidson, *supra* at 19. This Court has been unable to find any People's Law purporting to repeal or amend the Grenadian Act.

The People's Revolutionary Government was ousted through United States military intervention in October, 1983. Gilmore, *supra* at 11. General elections were held pursuant to the reinstated Grenadian Independence Constitution. The first law the new parliament passed was Act No. 1 of 1985 which provided in pertinent part: "2. For the avoidance of doubt it is hereby enacted that the following laws, rules and proclamations are in force, and shall remain in force until otherwise enacted: (1) Laws and rules made by the People's Revolutionary Government." *Mitchell v. Director of Public Prosecutions*, [1986] A.C. 73, 79.

In light of the foregoing, several conclusions may be drawn:

First, because of People's Law No. 5 and Act No. 1 of 1985, Grenadian law with which we are concerned remained constant throughout all times relevant to this suit despite the several changes in government.

Second, plaintiff's contention that the English Act of 1976 has force in Grenada is without merit. After Grenada's associate status was terminated in 1973, subsequently enacted English legislation was of no effect in Grenada.

The applicability in Grenada of the predecessors to the English Act of 1976, however, is less clear. Before the English Fatal Accidents Act of 1976, there were the Fatal Accidents Acts of 1959, 1864, and 1846 (hereinafter, together with amendments, the "English Acts"). The 1846 act was commonly known as "Lord Campbell's Act" and created the theretofore unrecog-

---

**3.** Originally discovered by Christopher Columbus in 1498, Grenada was thereafter settled by the French. W. Gilmore, *The Grenada Intervention* 11 n. 3 (1984). Grenada was then acquired by cession to the British Crown by France in the Treaty of Paris in 1763. 6 *Halsbury*, "Commonwealth & Dependencies" ¶ 1096.

From 1880 to 1962 "Grenada was governed, *with its own legislative and executive councils,* as part of the Windward Islands colony constituted in 1880." *Id.* (emphasis added). From 1962 to 1967 Grenada remained a part of the Commonwealth. *See* Gilmore, *supra* at 16–17; S. Davidson, *Grenada: A Study in Politics & the Limits of Int'l Law* 7–8 (1987).

nised cause of action for wrongful death. *See* Lord Campbell's Act (Fatal Accidents Act), 1846, 9 & 10 Vict., ch. 93.

The question thus presented to this Court is to what extent did Grenada *as a colony* have the power to pass the Grenadian Act in 1885, and, if it conflicted with the English Acts, to what extent was the Grenadian Act preempted by English law?

In general, Grenada as a colony possessed legislative powers similar to our states' police powers and could promulgate laws such as the Grenadian Act.[4] The English Colonial Laws Validity Act of 1865 governs the extent to which colonial law was permitted to conflict with English law.[5] As applied to this case, the Colonial Laws Validity Act dictates that if the Grenadian Act was "repugnant" to the English Acts, and the English Acts were intended to "extend" to Grenada, the English Acts to this day would prevail as the law of Grenada because the Grenadian Act would have *been and remained* absolutely void and inoperative. *See supra* n. 5.

Originally, the Grenadian Act and the English Act did not conflict. They both prescribed a twelve month period within which to commence suit. *See* Lord Campbell's Act (Fatal Accidents Act), 1846, 9 & 10 Vict., ch. 93; Fatal Accidents Act, 1864, 27 & 28 Vict., ch. 95; 1 Revised Laws of Grenada, ch. 65. In 1954, however, the time prescribed for the bringing of suit under the English Act was extended to three years. *See* Law Reform (Limitation of Actions, etc.) Act, 1954, 2 & 3 Eliz. 2, ch. 36, § 3; 23 *Halsbury's Statutes of England*, "Negligence" 784 note (3d ed. 1970). Because Grenada was still very much a colony in 1954, *see supra* at n. 3, its law was subject to the provisions of the Colonial Laws Validity Act—i.e., Grenadian law repugnant to English law which extended to Grenada was a nullity. *See supra* at n. 5. This Court is convinced, however, that the Grenadian Act is not repugnant to the English Acts, and that the English Acts were not intended to extend to Grenada.

Although English law has not settled the meaning of "repugnant" in this context, 6 *Halsbury*, "Commonwealth & Dependencies" at ¶ 1076 n. 2, to argue that a mere difference in the time prescribed for bringing suit is "repugnant" to another law which is similar in all but that respect, is to give the term "repugnant" too broad a sweep. It would be akin to proposing that, in light of the United States Constitution's Supremacy Clause, all state wrongful death statutes of limitation shorter than those at the federal level must fall. As a matter of English law, the term "repugnant" is to be interpreted narrowly.[6] Be-

---

4. *Halsbury's Laws of England* states that "[i]n each dependent territory there is an authority, other than the United Kingdom Parliament or Her Majesty in Council, *which is competent to make laws for the peace, order and good government of the territory.*" 6 *Halsbury*, "Commonwealth & Dependencies" ¶ 1073 (emphasis added) (footnote omitted). "Dependent territory" is defined as "a country which is subject to the control of the government of a state or country of which it is not an integral part...." *Id.* at ¶ 802. A dependent territory's power to make laws for the peace, order and good government of a territory "is to be construed, not as the power of a mere delegate, but as plenary and indeed sovereign within its limits." *Id.* at ¶ 1074 (footnote omitted).

5. The English Colonial Laws Validity Act of 1865 provides in pertinent part:

   An Act of Parliament, or any Provision thereof, shall, in construing this Act, be said to extend to any Colony when it is made applicable to such Colony by the express Words or necessary Intendment of any Act of Par-

liament.... Any Colonial Law Repugnant to the Provisions of any Act of Parliament extending to the Colony to which such Law may relate ... shall be read subject to such Act, Order, or Regulation, and shall, to the Extent of such Repugnancy, but not otherwise, be and remain absolutely void and inoperative. Colonial Laws Validity Act, 1865, 28 & 29 Vict., ch. 63, §§ 1 & 2.

6. That the term "repugnant" should not be interpreted liberally was recognized in 1901 by the Lord High Chancellor of England, the Earl of Halsbury (of *Halsbury's Statutes of England*), who stated:

   As to the other argument with reference to Legislation by a Colony which in some respects shall run counter to, or be repugnant to, some law of the United Kingdom, ... if it were construed in the wide sense ... would render Colonial legislation illusory altogether, because it is hardly possible to deal with the rights of any British subject by the local legislature which shall not in some way or another run counter to some provision in this country

cause a conservative reading of the term "repugnant" is authorized by English case law, this Court holds that the Grenadian Act was at no time repugnant to the English Acts.

Even if the Grenadian Act was repugnant to the English Acts, this Court holds that the English Acts did not "extend" to Grenada. It is clear that mere repugnancy to English law does not invalidate colonial law; the English Law must also extend, expressly or by necessary intendment, to the particular colony. *See* Colonial Laws Validity Act, *supra. See also Liyanage v. The Queen,* [1967] 2 A.C. 259, 284 (Colonial Laws Validity Act abolished vague doctrine of repugnancy to English law; to be invalid colonial law must be repugnant to English law applicable to that colony).

The Court notes that there is a general presumption against the extension of English law.[7] The Court also notes that the Grenadian Act, which purported to create a cause of action for wrongful death, was passed thirty-nine years after Lord Campbell's Act created a cause of action in England for wrongful death. This fact, coupled with the presumption against the extension of English law convinces the Court that the English Acts were not intended to, and did not, extend to Grenada.

In light of the foregoing, the Court holds that the Grenadian Act was the law of Grenada for all times relevant to this suit.

■ We now turn to the question of whether the Grenadian Act's limitation period is a condition precedent or a statute of limitations. The Grenadian Act provides in pertinent part:

An action for recovery of compensation under this Ordinance shall not be maintainable unless ... the action is commenced ... within twelve months from the time of death.

which is enacted for a different purpose, having no special reference to the circumstances of the particular Colony.
*The Queen v. Marais,* [1901] A.C. 51, 54.

**7.** Where colonies possess and have exercised the power of legislating on subjects for themselves, "there is every reason why legislation of the

Compensation for Injuries Ordinance, 1885, 1 Revised Laws of Grenada ch. 65, § 6. If the Grenadian Act's limitation period is a statute of limitations, CPLR 202 applies and plaintiff's wrongful death suit is barred *if* SGU is given leave to amend its complaint to add the statute of limitation as an affirmative defense. *See* CPLR 202. If the limitation period is a condition precedent, however, New York substantive law requires this Court to recognize that plaintiff's right to bring suit for wrongful death was extinguished twelve months after Earl Gehling's death. *See Schwertfeger v. Scandinavian American Line,* 186 A.D. 89, 90–91, 174 N.Y.S. 147 (1st Dept.1919), *aff'd* 226 N.Y. 696, 123 N.E. 888; *Weiss v. Baviello,* 203 Misc. 1031, 1032–33, 117 N.Y. S.2d 891 (Sup.Ct. Queens County 1952); *In re Tonkonogoff's Estate,* 177 Misc. 1015, 1023, 32 N.Y.S.2d 661 (Surrog.Ct. N.Y. County 1941).

English law holds most limitation periods to be procedural. They are viewed as statutes of limitation in the strict sense, not conditions precedent. *See, e.g., Williams v. Jones,* [1811] 104 Eng.Rep. 441; *Harris v. Quine,* [1869] 4 L.R.–Q.B. 653, 658; *Black–Clawson Int'l Ltd. v. Papierwerke Waldhoff–Aschaffenburg A.G.,* [1975] A.C. 591, 630. *See also* Dicey & Morris, *Conflict of Laws* 1103–1104 (9th ed. 1973) (English law generally regards limitation periods as procedural).

This English view is, however, not without exception. In discussing how English courts rule in cases such as the one *sub judice*—i.e., a local limitation period versus a foreign limitation period—a 1980 English Law Commission Working Paper states:

*Exceptions*

... In the following cases it is thought that English law would regard a statute of limitation as substantive, with the re-

United Kingdom should not unnecessarily be held to extend to the Colonies and thereby overrule, qualify, or add to their legislation on the same subject." *New Zealand Loan & Mercantile Agency Co. v. Morrison,* [1898] A.C. 349, 457. *See also* 6 *Halsbury,* "Commonwealth & Dependencies" at ¶ 1080 (same).

sult that the *lex causae* would supply the appropriate period.

. . . . .

(c) Where a statute creates a new right and at the same time specifies that such right shall only continue for a limited period. *This might be exemplified by the law relating to fatal accidents. The Fatal Accidents Act of 1846 provided a new right of action to the dependents of those killed as the result of another's tort and fixed a special limitation period of twelve months for such claims even though, at that time, the limitations period for most claims in contract and tort was six years.*

Law Commission Working Paper No. 75, *Classification of Limitation in Private Int'l Law*, ¶ 8 (1980) (emphasis added) (footnotes omitted). *See also* Dicey & Morris, *supra* (same).

The Law Commission's choice of an example in the above-quoted passage indicates that English courts viewed the limitation period of Lord Campbell's Act as a condition precedent to bringing suit. In his affidavit submitted by SGU, Lloyd L. Noel, a duly admitted Barrister at Law, Solicitor, and Conveyancer in Grenada, avers at paragraph 10: "English precedents are part of Grenadian law and are followed in our courts." Because of Grenada's common law heritage this Court credits Mr. Noel's statement, and holds that Grenadian courts would follow English law and classify the Grenadian Act's limitation period as a substantive condition precedent.

This Court is bound to apply the construction that Grenadian courts would give to the Grenadian Act's limitation period. *See Chartener v. Kice*, 270 F.Supp. 432, 436 (E.D.N.Y.1967); *Schwertfeger, supra* 186 A.D. at 91, 174 N.Y.S. 147. Thus, plaintiff's wrongful death claim is dismissed because, under Grenadian law, the right to bring suit for wrongful death expired twelve months after Earl Gehling's death. *See* 1 Revised Laws of Grenada Ch. 65, § 6. For the same reason, SGU need not amend its answer since failure of a condition precedent need not be pled as an affirmative defense. *See generally* 2A

*Moore's Federal Practice* ¶ 9.04 (1987) (plaintiffs must plead compliance with conditions precedent).

We now turn to the second part of SGU's motion for summary judgment.

### III. *Negligence in the Running of the Race*

■ Plaintiff claims that a genuine issue of material fact exists as to SGU's sponsorship, responsibility and liability for the race. Specifically, SGU was allegedly negligent in conducting the road race, for permitting Earl J. Gehling to enter this event, and for inadequately treating him from the time of his collapse through the time of his death. The defendant, on the other hand, claims that SGU had no role in the control of the race, and therefore, owed the decedent no duty of care and, even if it owed the decedent a duty of care, it was fully satisfied.

Under New York law, to find a defendant liable for negligence, the defendant must have owed a duty to the plaintiff, the breach of which was the proximate cause of the plaintiff's injury. *Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339, 342, 162 N.E. 99 (1928). Absent a duty on the part of the defendant, there is no breach, and consequently, no potential for liability. *Vogel v. West Mountain Corp.*, 97 A.D.2d 46, 48, 470 N.Y.S.2d 475 (3d Dept. 1983). The failure of SGU to show that there is no issue of fact regarding any of these elements will result in denial of SGU's motion for summary judgment.

The Court finds that there are outstanding issues of fact. For instance, regarding duty of care, plaintiff claims that SGU not only sponsored the race but controlled it. *See Vogel, supra.* SGU, however, claims that at best it was a mere sponsor of the race, and thus owed Gehling no duty of care. *See Id.* Plaintiff then contends that SGU had a special relationship with Gehling such that it should have controlled the race; SGU denies the existence of such a relationship. *See Pulka v. Edelman*, 40 N.Y.2d 781, 390 N.Y.S.2d 393, 358 N.E.2d 1019 (1976). Regarding causation, plaintiff claims that the decedent's injury and subsequent death were due to a combination of

the tropical conditions under which the race was run, the failure to pre-screen race participants, and the poor quality of medical care rendered him upon his collapse. SGU, on the other hand, claims that Gehling's pre-existing, congenital heart defect caused the events underlying this suit. The parties' contentions are disputes over material issues of fact which must await resolution at trial.

### IV. *Assumption of Risk*

■ Alternatively, the defendant, citing the English case of *Murray and Another v. Harringay Arena, Ltd.*, [1951] 2 K.B. 529, argues that decedent's voluntary entry in the race, with a known heart ailment in tropical conditions, was an assumption of the risk that is an absolute defense, under English and Grenadian law, against all plaintiff's claims. Not only does the Court disagree, *see, e.g.*, *Ashton v. Turner*, [1981] Q.B. 137, and *Nettleship v. Weston* [1971] 2 Q.B. 691, but, as indicated *supra*, the law of New York governs this case.

■ Under New York law assumption of risk is not an absolute defense, but is, rather, a measure of the defendant's duty of care under all the circumstances, *Turcotte v. Fell*, 68 N.Y.2d 432, 510 N.Y.S.2d 49, 502 N.E.2d 964 (1986), and is a factor to take into account when assessing proportional culpable conduct. *Mesick v. State of New York*, 118 A.D.2d 214, 504 N.Y.S.2d 279 (3d Dept.1986). The issues of duty and proportional culpable conduct must await resolution at trial, being too fact-bound in this case for summary adjudication.

### V. *Negligent Medical Treatment or Medical Malpractice*

Plaintiff's claims that SGU, through its agents—i.e., those who treated the decedent at the race site, in the ambulance and at the General Hospital—was negligent in providing medical care to the decedent, thereby causing his death. Plaintiff's sixth claim is essentially the same, but is grounded in medical malpractice. The complaint, taken as a whole, is therefore broad enough to cover potential non-medical negligent actions, as well as possible wrongful "professional" actions committed by those associated with SGU.

The plaintiff argues that SGU controlled and had input over the General Hospital and the quality of medical care which was rendered the decedent there and in the government ambulance based on the following facts: 1.) SGU entered into an agreement with the Grenadian government on August 4, 1976, which provided that, in exchange for authorization to form and operate the medical school, SGU would pay Grenada an annual sum of $100,000 (U.S.) in medical supplies and equipment for use by the government at either the government-operated General Hospital or at other Grenadian health facilities, as well as $75,000 (U.S.) to be used by the government for governmental purposes; 2.) SGU was contractually granted sole and exclusive rights to use the facilities of the General Hospital for teaching purposes, subject to the right of the Grenadian government to operate and administer the General Hospital; and 3.) prior to 1982, SGU donated two ambulances to the Grenadian government. It is not clear whether the government-operated ambulance that carried the decedent to the hospital was one of the two ambulances that had been donated.

#### A. Treatment in the Ambulance

■ The defendant cannot, as a matter of New York law, be held responsible for any treatment the decedent received in the ambulance. The plaintiff has failed to establish sufficient involvement on the part of SGU with the operation of the government-owned and operated ambulance. She has merely established that Earl J. Gehling *may* have been transported in one of the two ambulances SGU donated to the Grenadian government. At most, therefore, any wrongful acts that may have been committed by ambulance personnel go to the question of damages that may have resulted from any negligence on the part of SGU for its role in the running of the race. *See e.g.*, *Derby v. Prewitt*, 12 N.Y.2d 100, 236 N.Y.S.2d 953, 187 N.E.2d 556 (1962); *Poplar v. Bourjois, Inc.*, 298 N.Y. 62, 80 N.E. 2d 334 (1948) (dictum). *See generally*, 100 A.L.R.2d 808, Annotation sec. 1 ("Where a

person has suffered personal injury by reason of another's (non-extraordinary) negligence, the tortfeasor is liable for any additional harm and expense caused the injured person by the negligence, mistake, or lack of skill of the attending physician or surgeon").

### B. Negligence vs. Medical Malpractice

■ Because plaintiff failed to make a sufficient showing as to SGU's connection with any wrongful acts which may have occurred in the ambulance, this Court did not differentiate between medical malpractice and negligence in deciding the "ambulance" issue *supra*. We now must examine the question of SGU's potential liability for either medical malpractice or negligence in treating Earl J. Gehling at the race site and at the General Hospital.

Under New York law, there exist several important differences between a cause of action for negligence and one for medical malpractice. "[I]f the activity in which an actor is engaged is non-professional or 'administrative' in nature, the actor, regardless of his professional status or title, is the servant of the institution, and the latter must respond in damages for [its] *negligence*". *Lewis v. Columbus Hosp.*, 1 A.D. 2d 444, 446, 151 N.Y.S.2d 391 (1956) (emphasis added). *See also Jones v. City of New York*, 134 N.Y.S.2d 779 (Sup.Ct.N.Y. County 1954), *rev'd on other grounds*, 286 A.D. 825, 143 N.Y.S.2d 628 (1st Dept.1955). On the other hand, if at the time of the alleged negligent acts were committed, the medical care professional was engaged in a "professional" or "medical" activity, he will be deemed to have been acting as an independent contractor. The institution in such a case cannot be held liable for any of his negligent acts, because the institution employing such medical care providers "undertakes, not to heal, but merely to supply others who will heal on their own responsibility." *Bernstein v. Beth Israel Hosp.*, 236 N.Y. 268, 270, 140 N.E. 694 (1923) *quoted with approval in Mrachek v. Sunshine Biscuit, Inc.*, 308 N.Y. 116, 123 N.E. 2d 801 (1954). *See also Cramer v. Hoffman*, 390 F.2d 19 (2d Cir.1968) (New York rule is an institution is not responsible for negligence of physicians who are independent contractors exercising their own discretion.) To hold a *hospital* vicariously liable for medical malpractice, it must be shown, *inter alia*, that there existed an employment relationship, rather than mere affiliation, between the alleged offending doctor and the institution. *Raschel v. Rish*, 69 N.Y.2d 694, 697, 512 N.Y.S.2d 22, 504 N.E.2d 398 (1986); *Hill v. St. Clare's Hospital*, 67 N.Y.2d 72, 79, 499 N.Y.S.2d 904, 490 N.E.2d 823 (1986). Moreover, to constitute malpractice the acts alleged must involve professional skill and judgment. *Zellar v. Tompkins Community Hosp., Inc.*, 124 A.D.2d 287, 288, 508 N.Y. S.2d 84 (3d Dept.1986). Thus, whereas an institution cannot be held liable in negligence for "professional acts" performed by its employees, the opposite is true in the case of medical malpractice. Likewise, there can be no medical malpractice imputed to an institution where there exist only "administrative" acts, although an action in negligence may lie.

### 1. Treatment at the Race Site

The evidence shows that at least three employees from SGU attempted to revive the decedent at the finish line of the race. Before either negligence or medical malpractice can be imputed to SGU, however, we must first determine the *capacity* in which these employees acted, i.e., whether these persons acted as servants of SGU or as independent contractors. This question is one of fact, to be determined at trial. If the trial reveals these persons acted as *independent contractors*, SGU cannot be held responsible for their actions in either an action for medical malpractice or negligence. On the other hand, if they were the servants of SGU, the school may be liable for medical malpractice as a principal under an agency theory, provided the acts were "medical" in nature. If the acts were "administrative", any negligence may be imputed to SGU. Because the question of agency of the medical personnel in attendance at the race is open to doubt, summary judgment is inappropriate here. *Cf. Hede-*

*man v. Fairbanks, Morse and Co.,* 286 N.Y. 240, 248, 36 N.E.2d 129 (1941).

### 2. *Treatment at General Hospital*

Although the General Hospital, where the decedent received his treatment, was operated and controlled by the Grenadian government, it was used by SGU as a "teaching hospital". SGU very likely had a significant contingent of its personnel and students affiliated with, and employed at, the General Hospital. Should the plaintiff prove that this was so, and that such personnel or students harmed Gehling in treating him at the hospital, SGU, as either master or teacher, may be vicariously liable. SGU's connection here is therefore far greater than in the case of the ambulance, and merits examination at trial.

Thus, while SGU cannot be held liable for either negligence or medical malpractice with regard to any wrongful acts which may have occurred in the ambulance, the plaintiff has raised triable factual questions as to SGU's role in treating the decedent both at the race site and at the General Hospital.

### VI. *Battery on a Corpse*

■ The substance of plaintiff's fifth cause of action is that the alleged unconsented post mortem examination performed on the decedent injured the plaintiff, the decedent and the decedent's father. The defendant contends that no such cause of action exists in either Grenada or New York, and even if such a claim were actionable, it would be time-barred under C.P.L.R. sec. 215, which provides for a one year limitation period for intentional torts. The plaintiff's pleadings must be liberally construed and all reasonable inferences arising therefrom must be drawn in her favor. *See Blum v. Probate Court of Chittenden County,* 575 F.2d 50, 53 (2d Cir.1978); Fed. R.Civ.P. 8(f).

Of course, Earl J. Gehling's estate cannot claim injury for the alleged unauthorized autopsy. Only those injuries which the decedent would have been able to sue for were he still alive may be sued for by his estate. *See* N.Y. Estates, Powers & Trusts Law 11–3.2 (McKinney supp. 1988).

Although the plaintiff would be time-barred under the one year limitations period for intentional tort, CPLR 215(3), under the three year period for negligence an action would be timely. Because the parties briefed this Court regarding this cause of action on the basis of Grenadian law, whether there is a New York cause of action sounding in negligence accruing to plaintiff for the unauthorized autopsy of decedent must await determination at trial. While plaintiff has alleged that the autopsy was requested by an SGU official, this alone is insufficient to establish negligence.

### VII. *Strict Liability*

■ The plaintiff contends that SGU should be held strictly liable for the defective design of the emergency and/or ongoing medical care treatment modalities used to treat Earl J. Gehling. These defects allegedly were knowingly and intentionally concealed by SGU, were supplied by the defendant, and were not altered in any way before they impacted upon plaintiff, leading to his death. The plaintiff attempts to connect SGU with the modalities based on the fact that SGU contributed the medical equipment, money and the ambulance to the Government of Grenada. Plaintiff contends that SGU in some way, therefore, controlled the ambulance personnel. The defendant denies such control, and also asserts that a strict liability theory is inapplicable to the facts of this case. We agree with the defendant.

In New York, imposition of liability irrespective of fault upon parties involved in placing *a product* into the stream of commerce is based on the principle that the party in the best position to have eliminated the danger must respond in damages. *Blackburn v. Johnson Chemical Co., Inc.,* 128 Misc.2d 623, 490 N.Y.S.2d 452 (Sup.Ct. Kings County 1985). Under strict products liability, those in the direct distributive chain, i.e., manufacturers, distributors, retailers, and makers of component parts of a defective product, can be found liable *provided* the defect was a substantial factor in causing the injury. *Id.* A *prima facie* case is not established unless the plaintiff can show that, in relation to those who will

use the product, the product was defective when it left the hands of the manufacturer or distributor because it was not reasonably safe. *Rosado v. Proctor & Schwartz, Inc.*, 66 N.Y.2d 21, 25–26, 494 N.Y.S.2d 851, 484 N.E.2d 1354 (1985). *Cf. Robinson v. Reed–Prentice Division of Package Machinery, Co.*, 49 N.Y.2d 471, 481, 426 N.Y.S.2d 717, 403 N.E.2d 440 (1980).

Here, it is obvious that the plaintiff has failed to make out a *prima facie* case for strict products liability. Leaving aside the question of whether the provision of medical *services* and medicine to the decedent is a "product" for purposes of strict liability, *see, e.g., Samuels v. Health & Hospital Corp. of City of New York*, 432 F.Supp. 1283 (S.D.N.Y.1977). See also *Samuels v. Health & Hospital Corp. of New York*, 591 F.2d 195 (2d Cir.1979) (under New York law, furnishing of blood to hospital patient is incidental to a service and not a sale of a product, thereby precluding benefit of strict liability rules), plaintiff has done no more than make a bare allegation that the products in question were defective at the time they impacted on the decedent. She has provided no evidence of such defects or of their origin. Standing alone, the fact that SGU may have contributed money to the General Hospital and donated the ambulance to the Grenadian Government, does not create a duty on it to supervise how such gifts are to be utilized. Nor has plaintiff provided evidence sufficient to indicate that SGU had any control over the use of these gifts. In short, plaintiff's bare allegations, unsupported by any evidence, cannot survive a motion for summary judgment, and this claim is accordingly dismissed.

### Conclusion

The plaintiff's wrongful death claim is DISMISSED as the right to bring suit expired twelve months after Earl J. Gehling's death, four months before this suit was filed.

The defendant's motion for summary judgment as to: 1) strict liability and 2) medical malpractice and negligence from the time the decedent was removed from the race site through the time of his arrival at the General Hospital is GRANTED.

The defendant's motion for summary judgment as to: 1) negligence in the conduct of the road race; 2) medical malpractice and negligence at the race site and at the General Hospital; and 3) negligence in the context of an unauthorized autopsy is DENIED. A bench trial on these remaining issues will commence at 10:00 A.M., October 13, 1988.

SO ORDERED.